IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

---

UNITED STATES OF AMERICA; and
THE STATE OF MICHIGAN,

Ex rel. RITA DUBOIS,

                 Plaintiffs,

v.

VITAS HEALTHCARE CORPORATION
MIDWEST
26677 West Twelve Mile Road
Southfield, MI 48034

VITAS INNOVATIVE HOSPICE CARE
26261 Evergreen Road, Suite 400
Southfield, MI 48076

VITAS HEALTHCARE CORPORATION
100 S. Biscayne Boulevard, Suite 1300
Miami, Florida 33131

COMFORT CARE HOLDINGS CO.
255 East 5th Street, #2600
Cincinnati, Ohio 45202

      and

CHEMED CORPORATION
2600 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202-4726

              Defendants.

---

Civil Action No. 13-14602
FILED UNDER SEAL

PURSUANT TO 31 U.S.C. § 3730(b)(2)
CLAIM FOR JURY TRIAL

**AMENDED *QUI TAM*
COMPLAINT**

## I.      INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from the false or fraudulent claims that Defendants, Chemed Corporation and its subsidiaries (collectively as "Vitas") named above, presented or caused to be presented to the United States in violation of the federal False Claims Act, 31 U.S.C. §§ 3729-32.  These claims were fraudulent in that Vitas repeatedly and knowingly billed the Government for services rendered to:  (a) patients that were referred to Vitas as a result of illegal kickbacks; and (b) patients who were ineligible or inappropriate for hospice care.

2.      This action is also brought under the respective *qui tam* provisions of the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq*.  The State of Michigan and the United States are sometimes hereafter referred to collectively as "the Government."

## II.      JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730. This Court has supplemental jurisdiction over the state claims alleged herein pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b), the latter of which specifically confers jurisdiction over claims brought under the laws of any state for the recovery of

funds paid by a State or local government where, as here, the action arises from the same transaction or occurrence as an action brought pursuant to 31 U.S.C. § 3730.

4.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because Vitas Healthcare Corporation Midwest and Vitas Innovative Hospice Care can be found and have transacted business in the Eastern District of Michigan.

5.    Venue is proper pursuant to 31 U.S.C. § 3732(a), in that Vitas Healthcare Corporation Midwest and Vitas Innovative Hospice Care can be found and have transacted business in the Eastern District of Michigan.

6.    Relator, Rita DuBois ("DuBois" or "Relator"), has prepared and provided to the Attorney General of the United States and the United States Attorney for the Eastern District of Michigan a disclosure pursuant to 31 U.S.C. § 3730(b)(2), and its state law analog, of substantially all material evidence and information in her possession related to this Complaint and of which she is the original source. This disclosure supports the validity of the claims presented herein.

## III.    PARTIES

7.    Relator, Rita DuBois, is a citizen of the United States and a resident of the State of Michigan. From November 30, 2012 to January 15, 2014, DuBois worked at Vitas Healthcare Corporation Midwest as the Director of Market Development in Southeastern Michigan, where she was responsible for sales and marketing

programs covering Southeastern Michigan, including the city of Detroit, and nine surrounding counties including Oakland, Macomb, and Wayne Counties. The facts averred herein are based on DuBois' personal observations, the results of her investigation, and documents in her possession.

8.    Defendant Chemed Corporation is a Delaware corporation with a principal place of business at 2600 Chemed Center, 255 East Fifth Street, Cincinnati, Ohio 45202-4726. Shares of Chemed Corporation are listed on the New York Stock Exchange.

9.    Defendant Comfort Care Holdings Co. is a Nevada corporation with a principal place of business at 255 East 5th Street, #2600, Cincinnati, Ohio 45202. It wholly owns subsidiaries that operate Vitas' for-profit hospices across the United States, including Defendant Vitas Healthcare Corporation.

10.    Vitas Healthcare Corporation is a Delaware corporation with its principal place of business at 100 S. Biscayne Boulevard, Suite 1300, Miami, Florida 33131. It operates 51 for-profit hospice programs in 18 states, including Michigan, and the District of Columbia.

11.    Vitas Healthcare Corporation Midwest is a Delaware corporation with a registered office address at 26677 West Twelve Mile Road, Southfield, Michigan 48034. At all times relevant to this Complaint, Vitas was engaged in the business of providing hospice care to individuals who were Medicare beneficiaries.

4

12.    Vitas Innovative Hospice Care maintains a principal place of business at 26261 Evergreen Road, Suite 400, Southfield, Michigan 48076.

13.    The United States provides medical care and services for eligible citizens through federally-funded healthcare programs such as Medicare and Medicaid, acting through the Centers for Medicare & Medicaid Services ("CMS"), which programs are housed within the United States Department of Health and Human Services ("HHS").

14.    The State of Michigan funds medical care and services through state-level health care plans, approved by HHS, which administer the Medicaid program and under which medical services and items are paid for by the state government ("State Plans"). The State Plans, in turn, receive funds from the federal government for a statutorily-established share of the total amount expended on medical assistance by the State Plans.

## IV.    STATUTORY & REGULATORY BACKGROUND

The False Claims Act

15.    The False Claims Act ("FCA"), 31 U.S.C. § 3727 *et seq*., provides that anyone who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval to the United States, or who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (a "False Claim"), is liable to the United States for a civil penalty

between $5,500 to $11,000, plus three times the amount of damages the United States sustains because of each such act of that person.

16.     To encourage individuals with knowledge of fraud to come forward, the FCA allows a private person to bring a civil action on behalf of herself and the United States and to share in the recovery under the FCA.

17.     The FCA state-law counterparts enacted by Michigan create analogous liability for False Claims, and they also allow a civil action by a private person on behalf of herself and the state.

<u>The Anti-Kickback Statute</u>

18.     The Medicare and Medicaid Fraud and Abuse Act (the "Anti-Kickback Statute" or "AKS"), 42 U.S.C. § 1320a-7b, prohibits the offering or paying of any remuneration, directly or indirectly, in cash or in kind, to induce the recipient to purchase or recommend the purchase of any good or service for which payment might be made in whole or in part under any federal healthcare program.

19.     As part of the health care legislation enacted by Congress in 2010, the AKS was amended to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148 § 6402(f), 124 Stat. 119, 759. Hence, a violation of the AKS is deemed to be a *per se* violation of the FCA.

20.     As a healthcare provider who seeks and accepts Medicare/Medicaid reimbursements, Vitas is obligated to be knowledgeable of and to comply with all applicable statutes, regulations and guidelines.

## V.     VITAS' USE OF KICKBACKS LED TO THE SUBMISSION OF FALSE OR FRAUDULENT CLAIMS TO THE GOVERNMENT

21.     On information and belief, in connection with the submission of claims to Medicare and/or Medicaid, Vitas certified that such claims complied with all relevant laws and regulations, including the AKS.  These certifications were knowingly false when made, and Vitas knew that the claims would be ineligible for reimbursement if its violations of the AKS were known to the Government. Some of the violations of the AKS are described below.

22.     On information and belief, between June 2012 and August 2013, Vitas knowingly and willfully made monetary contributions to Swan for Life Cancer Foundation ("SFL"), a non-profit foundation founded by Dr. Farid Fata ("Fata"), to induce an ever-increasing stream of patient referrals from Fata.

23.     Fata was a Rochester Hills-based medical oncologist.  He was arrested on healthcare fraud charges on August 6, 2013 and stands accused of deliberately misdiagnosing patients to order unnecessary tests, improperly administering chemotherapy, and submitting $35 million false and fraudulent Medicare claims. He is currently being held without bail at a federal prison in Milan, Michigan.

24.     SFL offered support programs, education workshops, and wellness programs for cancer patients, their families and their friends.  On information and belief, no physicians were on the staff of SFL and it did not offer any clinical programs.

25.     On information and belief, Vitas sales representatives had approached Fata prior to Spring 2012 to discuss Vitas' hospice care services without success because Fata preferred another hospice care provider.  That changed in or around May 2012 when Vitas began a "special deal" with Fata and began to offer "extra services" to SFL.

26.     As a result of this special deal, over the next fourteen months Fata became Vitas' largest referral source.

27.     Relator first learned about Fata and SFL shortly after she joined Vitas.  Over the course of her employment, Relator observed that the usual sales and marketing procedures did not apply to Fata.

28.     Soon after joining VITAS, Relator learned of several contributions to SFL in exchange for Fata's patient referrals.

    a.     During a team meeting on or around December 12, 2012, Relator observed Jeanne Kalvaitis, then the Vice President of Hospice Operations, handling multiple check requests and talking about and signing over checks for Fata and SFL.  Kalvaitis discussed

8

checks in the amount of $4,000 and $6,000. She also stated that Vitas would issue several checks in smaller amounts.

b.     On December 13, 2012, Relator heard Kalvaitis tell Tracy Simmons, then the General Manager of Vitas – Southeastern Michigan, that if Fata did not pick up on the referrals of patients to Vitas, then Fata would not receive the checks.

c.     Relator also observed Kalvaitis became irate after finding out that Fata had referred patients to another hospice provider in Michigan. During a visit to SFL on or around December 13, 2012, when Relator by chance was following the sales representative for training purposes, Relator observed the sales representative ask a SFL staff member why referrals were being made to another hospice care provider. They were told that the referrals were done for political reasons and that the situation would be fixed. When Relator told the sales representative that it was inappropriate to question referrals to other hospice providers, the sales representative told Relator that she was under instruction from Kalvaitis to get an explanation.

29.   During the remainder of her employment, Relator continued to observe special treatment being extended to Dr. Fata.

30.     For example, despite Relator's role as the Director of Market Development overseeing all sales and marketing programs in the Southeastern Michigan region, she soon found that all decision-making involving Fata or SFL were being handled directly by Kalvaitis and Simmons.

31.     On information and belief, Simmons, and the sales representatives assigned to the Fata account would make sales calls to SFL staff to discuss Vitas' services instead of to Fata or any clinical staff in his medical practice.   On information and belief, Kalvaitis also visited SFL.

32.     Fata was also allowed to circumvent the usual procedures for making referrals.  Rather than calling the dedicated office referral telephone line to make referrals, Fata was allowed to contact one particular staff person at Vitas to arrange for all his referrals.   This special procedure exempted Fata from responding to many questions that would have been asked during regular intake.

33.     During her employment, Relator was repeatedly told by Simmons to keep quiet about what was going on within Vitas and not to air the program's "dirty laundry."

## VI.   VITAS' WILLFUL IGNORANCE OF INAPPROPRIATE HOSPICE CARE FOR PATIENTS LED TO THE SUBMISSION OF FALSE OR FRAUDULENT CLAIMS TO THE GOVERNMENT

34.     Throughout Relator's employment, she has observed that Vitas had a lackadaisical attitude towards patient care.

10

35.     Over time, Relator learned that Fata provided terrible patient treatment. For example, she learned from Kim Johnson, a registered nurse practitioner, that Fata would administer unnecessary procedures such as chemotherapy to patients who were close to death, and then would immediately refer them to Vitas.  In some cases, the patients were so ill that they would perish before Vitas could complete the admission paperwork.

36.     Johnson told Relator that some of Fata-referred patients were not hospice appropriate.

37.     Johnson told Relator that she could not work with Fata's patients because of his poor patient care.  She ultimately resigned from Vitas for this reason.

38.     On information and belief, Vitas knew that some of Fata's referred patients were ineligible or inappropriate for hospice care.

39.     On information and belief, Vitas nonetheless submitted claims for reimbursement for hospice care services provided to these patients.

VII.   **RELATOR'S COOPERATION WITH THE FEDERAL BUREAU OF INVESTIGATIONS**

40.     Relator contacted the Federal Bureau of Investigations and that U.S. Attorney's Office on August 10, 2013 concerning information she had on Dr. Fata and Vitas.

41.     After Ms. DuBois initiated contact with the FBI, she was contacted by U.S. Attorney Barbara McQuade via email on August 10, 2013.  On August 10 and 11,

11

2013, she communicated with and then met at her home with Ashijit Dixit, Special Agent of the US Department of Health and Human Service, Office of Inspector General, Office of Investigations, and Bryan Drake of the FBI.

42.     Since August 2013, Relator has continued to gather information and document events at the FBI's request.  For example, Agent Drake and an IT person returned to Relator's home on October 15, 2013 and again on January 24, 2014 to retrieve text messages from her phone.

## VIII.   RETALIATION AGAINST RELATOR

43.     Under Relator's management, the previously unsuccessful program achieved and exceeded goals within four months.  In March 2013, the program exceeded admissions goals by 31%.  Such progress resulted in Relator receiving a positive 90-day review.  Simmons in particular was very pleased with her performance, and often characterized her as a "God send."

44.     Between December 2012 and April 2013, Relator raised issues about the Fata account with Simmons, namely that she found it odd that the sales representatives were calling on charity to discuss referrals or to develop business, or the practice of allowing Dr. Fata to circumvent the usual procedure for making referrals.  Simmons' answers were always evasive.

45.     During the early part of April 2013, Vitas Southeast Michigan devoted a lot of effort and resources into preparing for visits from the President and CFO of

Vitas David Wester and Senior Vice President Ian Viente, who were there to evaluate the program and to see how Vitas Corporate can help move the business forward.

46.     On April 17, 2013, Relator, as part of the management team, participated in a series of meetings with Wester and Viente. During the meetings and at dinner that evening, she responded to Wester and Viente's questions on quality of care, referrals, and cost, raising issues that were especially related to Dr. Fata's referrals.

47.     The following day, Relator was called into a "coaching session" by Simmons, who told her she should have remained silent during the meetings and reprimanded her for airing the program's dirty laundry. Joseph Priestas, then the Director of Region Market Development, also called Relator in to an extended coaching session during which he berated her for raising issues in the meeting with Wester and Viente. These hostile coaching sessions were followed by admonishing emails and further meetings where Simmons and Priestas, with raised voices and intimidating tones, told Relator to keep quiet about the program's issues.

48.     The relentless hostility led Ms. DuBois to seek assistance from Vitas' Human Resources.

49.     Priestas, Kalvaitis, and Simmons continued to address Relator in a harassing and intimidating manner. They also began to assign her busy work – a tactic for managing out an unwanted employee. Due to this increased workload,

Relator was unable devote her entire effort on her team's sales efforts. As a result, the progress that had been made in the program fizzled.

50.    Surprised by her superiors' reaction to her indirectly raising issues about Dr. Fata, Relator began to investigate Vitas' relationship with Dr. Fata in earnest. At the same time, Simmons and Kalvaitis continued to exclude her from any decision make with regard to the Dr. Fata account.

51.    Relator was also isolated from other doctors who referred patients to Vitas. For example, when Relator expressed an interest in meeting Dr. Christopher Doig, a doctor who referred a disproportionately high number of referrals to Vitas, she was told by the assigned sales representative that the agreement between Vitas and Dr. Doig had been in place for a long time, and that she wasn't going to be meeting with Dr. Doig. The sales representative told Relator that she herself never gets to see Dr. Doig.

52.    In response to continued harassment by Vitas management's, Relator sought recourse through the EEOC, filing a complaint on July 29, 2013 and seeking mediation to resolve the hostile workplace issues.

53.    Simmons left Vitas at the end of July 2013, leaving a vacancy in the position of General Manager. Relator applied for the position on July 30, 2013. Although Relator was the most qualified candidate for the position, and despite her

excellent performance, Kalvaitis, who was in charge of interviewing and hiring for the position, refused to interview her for the position.

54.    On July 30, 2013, Relator sent an email to Wester and Viente to request an in-person meeting to discuss the Vitas Southeast Michigan program, ostensibly regarding employee issues and patient care.  While she intended to disclose what she had discovered regarding the Fata referrals and SFL contributions in her investigations, Ms. DuBois was deliberately vague in the email.  She did not receive any reply.

55.    On or around August 6, 2013, Dr. Fata was arrested.

56.    Around this time, Vitas' management stepped up its unreasonable and retaliatory adverse actions against Ms. DuBois.  On August 8, 2013, after over-hearing Relator and her sales representatives discuss Dr. Fata's arrest in advance of a team meeting, Kalvaitis harshly reprimanded them for talking about the "lies" against Dr. Fata, and stated that he would be proven innocent.  During this meeting, Kalvaitis instructed Linda Douglas to gather the Fata files and "scrub" them.  Shortly after the meeting, Kalvaitis called Relator and her sales representatives into another meeting and in aggressive and menacing tones verbally abused them, leading to the voluntary departure of three of Ms. DuBois' sales representatives in the following weeks.

57.    Vitas management refused to replace six of Relator's sales team members who had left the company, leaving Relator with only four sales representatives handling ten territories.  Vitas did not adjust the admissions goals to take into account the

15

shortage in sales team personnel.  Instead, when those goals were predictably not met, Vitas repeatedly criticized Ms. DuBois' job performance.  On or around August 9, 2013, Kalvaitis met with Relator to discuss a Written Warning letter that Kalvaitis was going to issue against Relator.  Kalvaitis stated that she, Simmons, and Priestas had spent hours combing through records to find everything they could to put into the warning letter.  As Kalvaitis reviewed each entry, Relator orally rebutted them, showing such to be false or unsubstantiated.  When Kalvaitis asked Relator to sign the letter, Relator refused, citing both her belief that some of the entries were inaccurate, and that she did not have her reading glasses to review the letter. Kalvaitis never provided a copy of the letter to Relator.  On October 28, 2013, when Relator received a Second Written Warning, she requested a copy of this first Written Warning.  She was not provided with a copy until early December 2013. While some of the more blatant falsehoods had been deleted from the letter, it continued to recite untruths about Relator's performance.

58.    In October 2013, Kim Mitchell was hired to replace Simmons.  In or around mid-August 2013 Kalvaitis transferred to another position within Vitas. The vacancy was not posted, which effectively denied Relator any opportunity to apply for the position despite her experience and qualification. Instead, she was replaced by Brandon Stock, a young man of about twenty-six who had no business

16

experience.  On September 16, 2013, Piestas also left the program and was replaced by Mary Kay Sasseti.

59.    On October 8, 2013, Stock instructed Relator to lower the admissions goal for the four remaining sales representatives but did not adjust the team's overall monthly goal.  Instead, he unreasonably instructed Ms. DuBois to take on the remainder of the team goals.  Not surprisingly, the Relator's team continued to fail in making its goals.

60.    Upon information and believe, the FBI attempted to question Kalvaitis, Montville, Simmons and McFall on or about October 23, 2013.  On the same day, Mitchell held an unscheduled meeting with the entire staff at Stock's request.  She informed the staff that a private investigator had contacted current and former employees about the Dr. Fata case.  She also instructed the staff to not speak to anyone, including law enforcement, unless they had a subpoena.

61.    On October 25, 2013, the Department of Justice issued a subpoena to Vitas Healthcare Corporation regarding litigation against SFL.

62.    On October 28, 2013, Stock issued a Second Warning Letter to Relator on the grounds that her monthly admissions goals were not met.  The letter was back-dated to October 18, 2013.

63.    On November 4, 2013, Ms. DuBois filed a *qui tam* complaint in the United States District Court for the Eastern District of Michigan.

17

64.    On November 6, 2013, Relator was pulled out of a management meeting to have a coaching session with Mitchell about her expenses. Relator was confused about Mitchell's reprimands since she had followed Vitas procedures in submitting her reimbursements. Indeed, one item on which Mitchell questioned Relator had been approved contemporaneously by Nancy Wallent, Mitchell's direct report.

65.    Later that day, Mitchell instructed Relator to not attend the next day's regularly scheduled 9:00 a.m. managers' meeting in person, telling her that Stock wanted Relator to work out in the field. On the morning of November 7, 2013, Relator noticed that she had been disinvited to all managers' meetings. Thinking this was a mistake, Relator called Mitchell. Mitchell was evasive, but told Relator to call back at 10:00 a.m. When Relator called back, the receptionist told her that all the managers were in a meeting. After Relator insisted that she was supposed to be in that meeting, she was told to call back in ten minutes.

66.    When Relator was connected to the meeting, the other managers – Linda Douglas, Janet Essex, Nicole Nguyen-Johns, Jackie Morgan, Mitchell, and Stock were present. The meeting proceeded according to the agenda of the usual managers' meetings without anyone discussing what the subject matter was of the 9:00 a.m. meeting. Stock told the managers that the government as well as Vitas' parent company Chemed may be conducting audits, and instructed them to treat

18

any internal audit as though it were an audit by the state.  He reported that a subpoena had been issued against Vitas for records pertaining to Dr. Fata and SFL. He told the managers present that they had the right to counsel, and strongly suggested that they not discuss Dr. Fata or SFL with anyone without a subpoena. Stock also asked Relator, Janet Essex, Nicole Nguyen-Johns and Kim Mitchell to send in their emails about Fata and SFL to him.  Linda Douglas, the Head of Nursing, and Morgan, the Admissions Nurse, was not required to send Stock their emails.

67.    From and after this meeting, Relator noticed a palpable difference in the way she was treated in the office.  She noticed that her colleagues became reluctant to share information with her, and other staff stopped talking whenever she walked by.

68.    All the while, Vitas' pattern of adverse employment actions against Relator continued unabated.  Relator's superiors, including Mary Kay Sassetti, continued to assign her busy work and nitpick the work product to criticize Relator's job performance.  From November 2013 to her termination on January 15, 2014, Relator would again be periodically excluded from the 9:00 a.m. management meetings.  Moreover, for those meetings to which Relator was invited, Mitchell would often be late and would have to postpone the meeting until 10:30 a.m. or 11:00 a.m.  Because Relator was instructed to prioritize these meetings or calls,

Relator often had to adjust her schedule or cut short appointments with prospects in the field. This hampered Relator's ability to maximize her efforts in the field.

69.     On November 18, 2013, Relator was asked to set up a meeting between Dr. Afzal Beemath and a Vitas Assistant Vice President and Kim Mitchell. When Relator, as the Director of Market Development for the area, requested to attend the meeting, she was refused without any articulated reason. Furthermore, she was not told what the subject matter of the meeting would be.

70.     On the same day, after Relator's request to attend the meeting with Dr. Beemath had been denied by Mitchell, she received an email from Mitchell that blamed Relator for staff turnover and failure to meet monthly admissions goals.

71.     Upon information and belief, after the meeting with Dr. Beemath, who had previously only referred three patients to Vitas between June 1, 2012 and July 31, 2013, suddenly referred 4 patients to Vitas in November, 2013.

72.     On or around January 6, 2014, while Relator was conducting a performance review of one of her sales representatives, Jessica Knapp, Knapp disclosed to Relator that she had been providing benefits to the Vitas admissions nurse, Jackie Morgan, to ensure that referrals by Knapp were handled and processed promptly. In further conversations, Knapp disclosed that she, and others, offered "bribes" to Morgan such as expensive bottles of red wine, lunches

and dinners at fine restaurants, and tickets to baseball games. If these benefits were not provided, their admission rates would fall off. Knapp stated that she felt like she was being held hostage.

73.    On January 7, 2014, Relator reported this to Kim Mitchell. Mitchell, under Stock's instruction, asked Relator to schedule a meeting with Mitchell and Bob Miller, Senior Vice President of Operations and Compliance Officer, to discuss the incident.

74.    When Relator told Knapp that she had reported the incident to Mitchell, Knapp told Relator that Mitchell had reached out to her on her day off, and told Knapp that she was to receive an increase in salary of $9,000. Relator was surprised that Knapp had been given a 15% raise, since Knapp had not made her admissions goal in many months and Mitchell had twice pressed Relator to issue a warning letter against Knapp in December 2013. Moreover, even though Knapp was Relator's direct report, no one discussed the salary increase with her.

75.    On January 8, 2014, during the meeting with Mitchell and Miller, Mitchell reported that when she interviewed Knapp, she denied that she was giving kickbacks to Morgan to ensure patient admission. Miller then commented that even if Knapp did provide benefits to Morgan, while it may be unethical, it did not rise to the level of being illegal.

76.     On January 15, 2014, Relator was discharged from Vitas.  Relator was told that the reason for her termination was due to her not meeting admissions goals for a number of months.

77.     On January 22, 2014, Relator applied for unemployment benefits from the Michigan Department of Licensing and Regulatory Affairs.  Relator also filed a wrongful termination complaint with the E.E.O.C. on January 23, 2014.

78.     Relator was informed on or around February 10, 2014 that Vitas challenged her application for unemployment benefits and had reported that she was terminated for misconduct.

79.     Vitas failed to substantiate its claim that Relator was terminated for misconduct.

80.     On February 28, 2014, Relator was notified by the Michigan Department of Licensing and Regulatory Affairs that Vitas' claim was unfounded and she is not disqualified from receiving unemployment benefits.

## IX.     DAMAGES TO THE GOVERNMENT

81.     Relator believes and avers that the misconduct described above resulted in the presentation of false or fraudulent claims to the Government both during and prior to Relator's employment with the company, as early as June 2012 when Vitas' relationship with Fata started.

82.     Relator is unaware of the precise amount of damage suffered by Medicare, Medicaid, and/or other Government health programs through the false or fraudulent claims that resulted from kickback-related referrals that were presented to the Government, but believes that they are substantial, and may involve all revenue that Vitas derived from patients referred by Fata.

## COUNT I
## False Claims Act
## (Anti-Kickback Statute)

83.     Relator repeats and restates the allegations contained in Paragraphs 1 through and including 82 of the within Complaint.

84.     By its conduct, Vitas knowingly, and/or improperly, billed Medicare and Medicaid, violated the AKS, and caused false or fraudulent claims to be presented to Medicare and Medicaid in violation of the False Claims Act, 31 U.S.C. §§ 3729-32.

85.     The United States approved and paid numerous claims to Vitas that it otherwise would not have paid had it been aware of Vitas' misconduct in providing kickbacks for patient referrals.

86.     By reason of these payments, the United States has been damaged and may continue to be damaged in an amount yet to be determined.

WHEREFORE, with respect to COUNT I, Relator Rita DuBois demands judgment in her favor and in favor of the United States against the Defendants, as follows:

(A)     Judgment in favor of the United States in an amount equal to three times the damages the United States has sustained because of Defendants' conduct, together with a civil penalty of not less than $5,500 nor more than $11,000 for each violation of the False Claims Act, 31 U.S.C. § 3729;

(B)     Judgment in favor of Relator, as a Qui Tam Plaintiff, for a portion of the judgment in favor of the United States pursuant to 31 U.S.C. § 3730(d), and for all costs of this action, including, but not limited to, attorneys' fees, expert fees, and court costs; and

(C)     Judgment in favor of United States and Relator for such other and further relief as the Court deems just and proper.

## COUNT II
### False Claims Act
### (False or Fraudulent Claims)

87.     Relator repeats and restates the allegations contained in Paragraphs 1 through and including 86 of the within Complaint.

88.     By its conduct, Vitas knowingly, and/or improperly, billed Medicare and Medicaid and caused false or fraudulent claims to be presented to Medicare and Medicaid in violation of the False Claims Act, 31 U.S.C. §§ 3729-32.

89.     The United States approved and paid numerous claims to Vitas that it otherwise would not have paid had it been aware of that some of the patients were ineligible or inappropriate for hospice care services.

24

90.    By reason of these payments, the United States has been damaged and may continue to be damaged in an amount yet to be determined.

WHEREFORE, with respect to COUNT II, Relator Rita DuBois demands judgment in her favor and in favor of the United States against the Defendants, as follows:

(A)    Judgment in favor of the United States in an amount equal to three times the damages the United States has sustained because of Defendants' conduct, together with a civil penalty of not less than $5,500 nor more than $11,000 for each violation of the False Claims Act, 31 U.S.C. § 3729;

(B)    Judgment in favor of Relator, as a Qui Tam Plaintiff, for a portion of the judgment in favor of the United States pursuant to 31 U.S.C. § 3730(d), and for all costs of this action, including, but not limited to, attorneys' fees, expert fees, and court costs; and

(C)    Judgment in favor of United States and Relator for such other and further relief as the Court deems just and proper.

## COUNT III
### Michigan False Claims Act

91.    Relator repeats and restates the allegations contained in Paragraphs 1 through and including 90 of the within Complaint.

92.    By its conduct, Vitas knowingly presented or caused to be presented false or fraudulent claims to the State of Michigan in violation of Mich. Comp. Laws § 400.601 *et seq.*

93.    As the direct, proximate, and foreseeable result of its fraud, Vitas caused numerous false or fraudulent claims to be presented to the State of Michigan and paid to Vitas, which claims would not have approved and paid had the State of Michigan been aware of Vitas' false or fraudulent conduct.

94.    By reason of these payments, the State of Michigan has been damaged and may continue to be damaged in an amount yet to be determined.

WHEREFORE, with respect to COUNT III, Relator Rita DuBois demands judgment in her favor and in favor of the State of Michigan against the Defendants as follows:

(A)    Judgment in favor of the State of Michigan in an amount equal to three times the damages the State of Michigan has sustained because of Defendants' conduct, together with a civil penalty of not less than $5,000 nor more than $10,000 for each violation of Mich. Comp. Laws § 400.601 *et seq.*;

(B)    Judgment in favor of Relator, as a Qui Tam Plaintiff, for a portion of the judgment in favor of the State of Michigan pursuant to Mich. Comp. Laws § 400.610(a), and for all costs of this action, including, but not limited to, attorneys' fees, expert fees, and court costs; and

(C)    Judgment in favor of the State of Michigan and Relator for such other and further relief as the Court deems just and proper.

## COUNT IV
## FALSE CLAIMS ACT
### (Retaliation)

95.    Relator repeats and restates the allegations contained in Paragraphs 1 through and including 94 of the within Complaint.

96.    Prior to joining Vitas, Relator was employed as a financial advisor at the annual salary of $75,000.

97.    Vitas, through recruiter Robyn Sauser, aggressively recruited Relator to the Director of Market Development position.

98.    Relator was promised a bi-weekly salary $3,269.23, which, annualized, would be $85,000. Moreover, Relator was eligible to participate in Vitas' bonus structure. But for Vitas' continued retaliatory and obstructive efforts that affirmatively denied Relator both the resources and opportunity to attain goal, she would have been able to achieve her monthly goals. Her maximum compensation, with bonus, would have been $130,000.

99.    Vitas' pattern of retaliation against Relator began after she sought to address issues stemming from the Dr. Fata referrals with Vitas' President and CFO David Wester and Senior Vice President Ian Viente.

100.   But for Vitas' wrongful conduct, DuBois expected to continue working at Vitas up to her normal retirement age of 65.

101.   Relator engaged in protected conduct within the meaning of 31 U.S.C. § 3730(h).

102.   Vitas harassed, retaliated against, and discharged Relator because of her protected conduct.

103.   Vitas acted deliberately in terminating Relator.

104.   As a result of Vitas' conduct, Relator has suffered lost income and additional compensation in the form of lost bonuses.

105.   As a result of Vitas' wrongful conduct, DuBois is entitled to two times her back-pay plus interest and compensation for all special damages sustained as a result of Vitas' wrongful conduct, including litigation costs and reasonable attorney's fees.

WHEREFORE, with respect to COUNT VI, Relator Rita DuBois demands judgment in her favor against the Defendants as follows:

(A)   Judgment in favor of Relator for two times her back-pay plus interest and compensation for all special damages to be proven at trial, and for all costs of this action, including, but not limited to, attorneys' fees, expert fees, and court costs; and

(B)   Judgment in favor of Relator for such other and further relief as the Court deems just and proper.

28

## COUNT V
### Wrongful Termination/Retaliatory Discharge
### (Michigan's Whistleblower's Protection Act, MCLS § 15.361 *et seq.*)

106.   Relator repeats and restates the allegations contained in Paragraphs 1 through and including 105 of the within Complaint.

107.   Shortly after Dr. Fata's arrest, Relator contacted the FBI and reported her knowledge of Vitas' special arrangements with Dr. Fata.

108.   Since then, Relator has continued to cooperate with the FBI in its investigations.

109.   Relator engaged in protected activity within the scope of Michigan's Whistleblower's Protection Act, MCLS § 15.361 *et seq.*

110.   Upon information and believe, Vitas knew that Relator had been questioning and investigating its relationship with Dr. Fata.

111.   Upon information and believe, Vitas knew that Relator had been cooperating with the FBI in its investigations into Dr. Fata and Vitas.

112.   Upon information and believe, Vitas knew that Relator was about to or has reported the sales teams practice of providing kickbacks to the admissions nurse to ensure that their patients would be admitted in a timely fashion.

113.   Relator was terminated on January 15, 2014 because Vitas knew her to be cooperating with the FBI and was providing information about Dr. Fata and other unlawful practices in the Southeast Michigan program.

29

WHEREFORE, with respect to COUNT V, Relator Rita DuBois demands judgment in her favor against the Defendants as follows:

(A)    Judgment in favor of Relator and compensation for all damages to be proven at trial, and for all costs of this action, including, but not limited to, attorneys' fees, expert fees, and court costs; and

(B)    Judgment in favor of Relator for such other and further relief as the Court deems just and proper.

### *RELATOR DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE*

Dated:  April 7, 2014

RITA DUBOIS, Relator,
By her attorney,

By: /s/William D. Gilbride, Jr.
     William D. Gilbride, Jr. (P36830)
     ABBOTT NICHOLSON, P.C.
     300 River Place, Suite 3000
     Detroit, Michigan 48207-4225
     (313) 566-2500
     wdgilbride@abbottnicholson.com

Of Counsel:

Elizabeth K. Ainslie (P35870)
Theresa E. Loscalzo (P52031)
Stephenie W. Yeung (P84415)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103-7286
(215) 751-2000
(Admitted in the Commonwealth of Pennsylvania)

4830-8552-2202, v. 1